UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

_____x

VISIONQUEST NATIONAL, LTD.,                Civ. No.

                              Plaintiff,

          -against-                        **VERIFIED COMPLAINT**

CITY OF PHILADELPHIA
and PHILADELPHIA ZONING
BOARD OF ADJUSTMENTS,

                              Defendants.

_____x

   Plaintiff VisionQuest National, Ltd. ("Plaintiff" or "VisionQuest") by and through its

undersigned counsel, brings this damages and injunctive relief action under Title 42, United

States Code, Section 1983, relating to the arbitrary and discriminatory practices engaged in by

defendants City of Philadelphia ("the City") and the Philadelphia Zoning Board of Adjustment

relating to its attempts to prevent 60 primarily Hispanic child refugees ("Child Refugees") from

moving into a safe, habitable and professionally-staffed facility operated by Plaintiff on Old

York Road in Philadelphia, Pennsylvania ("the Facility"). Despite the fact that this Facility is

already zoned for Group Living, and has been previously used as a home for children, the City

has refused to permit the federal Office of Refugee Resettlement ("ORR") to place these 60

children in the Facility pursuant to a contract between ORR and Plaintiff, based, at least in

substantial part, on the fact that most of these Child Refugees are from Central America and are

Hispanic.

## The Parties

   1.  Plaintiff VisionQuest National Ltd. ("VisionQuest") is an Arizona corporation

that provides shelter and support facilities for children. VisionQuest has a leasehold interest in

the real property owned by OYR Realty Partners located at 5201 Old York Road, Philadelphia, PA 19141 ("the Property"). VisionQuest has contracted with the Department of Homeland Security's Office of Refugee Resettlement ("ORR") to provide temporary housing and services for Unaccompanied Alien Children ("AIC") at the Property.

2.      Defendant City of Philadelphia ("the City") is a municipal corporation chartered by the Commonwealth of Pennsylvania under the Act of April 21, 1949, P.L. 665, § 1, et seq.

3.      The Philadelphia Board of Zoning Adjustments is a division and instrumentality of the City of Philadelphia.

**Factual Background**

4.      For many years, the Property has been used as a residential facility for adolescents pursuant to a "Group Living" use designated by the Philadelphia Zoning Code ("the Code"). "Group Living" is defined under the Code as "Residential occupancy of a building or any portion thereof that is not categorized as a household living use … and that typically provides communal kitchen/dining facilities." Group Living facilities include "group homes" and "temporary overnight shelters." See, e.g., Code § 14-601(2)(b).

5.      Starting in 2010, Plaintiff operated the Facility pursuant to an Application for its use as a residential facility for a total of 145 residents between the ages of 13 and 18. Upon review and approval by the City's Department of Licenses and Inspections ("L&I"), the examiner added a handwritten note to the Application stating: "Residents not under the jurisdiction of any court per Tom Chapman, Esq. Blank Rome LLP." See **Exhibit A** attached hereto.

6.      Upon information and belief, in adding the "not under the jurisdiction of a court" language, the City examiner was indicating that the Property and the Facility would not be used

as a "Private Penal and Correctional Institution" to house juvenile criminal offenders, as defined by the Philadelphia Zoning Code ("the Code").

7.     The Code defined "Private Penal and Correctional Institution" as follows: "An institution operated by a private party under contract with the City of Philadelphia, the Commonwealth of Pennsylvania or the federal government for the confinement of offenders sentenced by a court and still under the jurisdiction of a court." See Code at § 14-100(67A), prior version of which is attached as **Exhibit B**. This is essentially a *private* prison of halfway house, as contrasted with a "Public Penal and Correctional Institution," which the former Code defined as an "institution operated by the City of Philadelphia, the Commonwealth of Pennsylvania or the federal government for the confinement of offenders sentenced by a court and still under the jurisdiction of a court." Code at § 14-100(67B), attached at Ex. B.

8.     Thus, the language "under the jurisdiction of a court," understood in context, was clearly intended to denote a facility for the confinement of convicted criminals who had been sentenced by the criminal court and were still under its jurisdiction.

9.     Whether private or public, a "Penal and Correctional Institution" is a "Regulated Use" that, like adult book stores, adult film theaters and cabarets, is not permitted in certain areas of the City due to its perceived impact on the surrounding neighborhoods.

10.    In adding the phrase "not under the jurisdiction of a court" to the Application, the L&I examiner, upon information and belief, was ensuring that the Property would not be used as a "Penal and Correctional Institution" and therefore did not need registration as a "Regulated Use."

11.    Following the City agency's initial denial of the Application, on March 24, 2010, the City Zoning Board of Adjustment ("ZBA") granted use variance relief, and on March 26,

2010, the owner of the Property, OYR Realty Partners, LP ("OYR") obtained a use permit, stating in relevant part: "For the use of existing … Building for diagnostic, treatment, educational and residential facility for 145 residents between the ages of 13 and 18. Residents not under the jurisdiction of any court …." See Use Permit attached hereto as **Exhibit C**.

12.     Starting in 2010, the Property and the Facility were used as a "Group Living" facility for juveniles who were not juvenile criminal offenders.

13.     In or about October 2018, VisionQuest entered into a cooperative agreement ("the Contract") with ORR to provide services to 60 unaccompanied and undocumented minors under the jurisdiction of ORR. Under the Contract and as provided by statute, VisionQuest undertook to "provide residential shelter and services" for "unaccompanied children," or children who were under age 18 and who had no lawful immigration status in the United States or parent or legal guardian in the United States to provide care and physical custody. See 6 U.S.C. § 279(g)(2) (incorporated into the Immigration and Nationality Act as 8 U.S.C. § 1232(g). The "residential shelter and services" to be provided by VisionQuest include physical care and maintenance (living accommodations, food, clothes, personal grooming items), medical and dental care, individualized needs assessments, educational services and services to identify relatives and/or potential legal guardians who may take physical custody of the unaccompanied child. *Id.*

14.     In furtherance of its obligations under the Contract, VisionQuest hired approximately 70 staff members (including medical, educational and social services providers), with plans to hire approximately 50 additional staff members when it is certain that the Child Refugees will be permitted to move into the Property.

15.     Upon information and belief, under Pennsylvania law, VisionQuest's existing use permit allows VisionQuest to operate the Facility to accommodate the 60 Child Refugees it has contracted to care for under the Contract with ORR.

## The Unaccompanied Alien Children Program

16.     Every year, thousands of children enter the United States with no parent or legal guardian. These children are designated as "Unaccompanied Alien Children" who cross the border to escape violence and abuse or to join family members who have already entered the United States. See "A Guide to Children Arriving at the Border: Laws, Policies and Responses," American Immigration Council Special Report (June 26, 2015) ("AIC Report"), attached hereto as **Exhibit D**, at p. 2.

17.     When the entry of these Child Refugees peaked at 68,541 in 2014, then President Barack Obama issued a Presidential Memorandum stating that the "influx of unaccompanied alien children (UAC) across the southwest border of the United States has resulted in an urgent humanitarian situation…." See "Unaccompanied Alien Children: An Overview," William A. Kandel (Congressional Research Service, January 18, 2017) ("CRS Memo"), attached hereto as **Exhibit E**.

18.     This national crisis is being predominantly handled by the United States Department of Health and Human Services Office of Refugee Resettlement ("ORR"), a federal agency that operates the Unaccompanied Alien Children Program ("UACP").

19.     The UACP was created in 2002, when Congress transferred the care and custody of unaccompanied alien children from the Immigration and Naturalization Service ("INS") to ORR in order "to move away from the adult detention mode." See ACF Fact Sheet (March 2019), attached hereto as **Exhibit F**.

20.     Pursuant to the Homeland Security Act of 2002 and the Trafficking Victims Protection Reauthorization Act of 2008, the UACP is required to ensure that each child is "promptly placed in the least restrictive setting that is in the best interest of the child, "develop a plan to ensure the timely appointment of legal counsel," "ensure that the interests of the child are considered in decisions and actions relating to [their] care and custody," and "screen[] each [child] to determine if the child has been a victim of a severe form of trafficking in persons, if there is credible evidence that the child would be at risk if he or she were returned to his/her country of nationality or last habitual residence, and if the child has any possible claim to asylum." See CRS Memo, attached as Exhibit E, at p. 8.

21.     To comply with these mandates, "the majority of youth are cared for initially through a network of state-licensed, ORR-funded care providers that offer classroom education, mental and medical health services, case management, and socialization and recreation." *Id*., CRS Memo at 8. These facilities "facilitate the release of [children] to family members or other sponsors who are able to care for them." *Id*. Most of these children "are reunified with family members." *Id*. at p. 10.

22.     The process by which Child Refugees reach facilities such as that maintained by VisionQuest in Philadelphia is often a long and complicated one. Children immigrants are first sent to a "processing center," such as the largest one located in McAllen, Texas. Most recently, the McAllen processing center and others have been overwhelmed, leading to the establishment of temporary emergency centers established throughout the United States. See, *e.g.,* BuzzFeed News, March 30, 2019, "It's Hell There: This is What it's Like for Immigrants Being Held in a Pen Underneath an El Paso Bridge," attached hereto as **Exhibit G**. Those who have been

detained in such facilities have reported that they have "endured cold and windy nights sleeping on bare, rocky dirt … [with] nothing but thin, mylar blankets." *Id.*

23.     United States immigration officials have admitted that "they have been overwhelmed by the influx of migrant families trying to enter the country, filing facilities to capacity, and forcing officials to temporarily house people [in facilities like the one under the El Paso bridge] as a transition shelter." *Id.*

24.     Due to the scarce supply of housing such as that provided by VisionQuest, the U.S. government has been forced to establish "emergency influx shelters" solely for children, such as to ones recently established in Homestead, Florida and Tornillo, Texas. See Congressional Testimony of UC Davis School of Law Professor J.J. Mulligan Sepulveda, February 27, 2019, attached hereto as **Exhibit H**.

25.     According to Professor Sepulveda, these emergency shelters for children house thousands of children at a time, including several hundred in the same room, which do not meet "standards [that] are the minimum necessary to provide a safe and healthy environment of children in the government's care." *Id.*

26.     By law, Unaccompanied Alien Children cannot be held in processing facilities like those in McAllen, El Paso, Homestead or Tornillo, Texas for more than 72 hours. See 8 U.S. C. § 1232(b)(3); see also NBC Report, attached hereto as **Exhibit I**. Nevertheless, because of the backlog at HHS centers for children, hundreds of minors are forced to stay past that limit." *Id*. In short, these facilities simply "are not prepared or qualified to deal with the challenges that come with caring for a child." *Id.*

27.     In 2018, the UACP processed 49,100 children, predominantly arriving from Guatemala, El Salvador and Honduras. However, there are only 100 UACP shelters nationwide, UAC Frequently Asked Questions, dated August 7, 2018 ("FAQ"), attached hereto as **Exhibit J**. Consequently, the existing shelters cannot accommodate the number of children at issue, forcing the children to either remain at emergency influx centers or to be released without supervision in the United States.

**The City Refuses to Permit VisionQuest to Provide Shelter to Child Refugees**

28.     VisionQuest is one of these ORR-funded care providers, meeting all of the requirements and standards set by ORR for its participating facilities. The VisionQuest Facility does not accept any criminal, violent or potentially dangerous juveniles, who must be housed in secure detention facilities, not facilities such as those maintained by VisionQuest.

29.     Nevertheless, in January 2019, when the City became aware of VisionQuest's intention to use the Property and Facility as temporary housing for "Unaccompanied Alien Children" who had no criminal charges pending against them, but who had crossed the U.S./Mexico border into the United States unaccompanied by a parent, relative or legal guardian, the City abruptly, arbitrarily and irrationally decided that the Property and Facility could not be used for this purpose despite the continued and undisputed permitted use for that purpose.

30.     In response to community opposition to the proposed VisionQuest housing of Child Refugees, the Philadelphia Board of License and Inspections ("L&I") visited the facility on January 22, 2019 and, the following day, on January 23, 2019, cited VisionQuest for alleged improper zoning by determining that a shelter providing services for Philadelphia youth was a different use than a shelter providing services for unaccompanied alien minor refugees and,

therefore, required a new zoning permit. A copy of the Violation Notice is attached hereto as **Exhibit K**.

31.     VisionQuest disputed this violation and petitioned the Zoning Board of Adjustments (ZBA") to overrule the L&I determination. See Application for Appeal, attached hereto as **Exhibit L**.

32.     On March 19, 2019, the ZBA heard VisionQuest's appeal. During the hearing, the City conceded, upon information and belief, that VisionQuest was not proposing to use the Property and Facility as a Detention and Correctional Facility" since the refugee children were not being confined there as punishment, which is a necessary element for any finding under the Pennsylvania Code that any facility falls within the definition of the term "Detention and Correctional Facility" under Code § 14-601(4)(d), *i.e.*, an "institution … for the confinement and punishment and treatment or rehabilitation of offenders under the jurisdiction of the court").

33.      VisionQuest also prepared and submitted a "Program Description" to the City, emphasizing that its "Grace Dix Center" facility and program for Refugee Children was "not part of President Trump's current immigration program which separates immigrant children from their parents and puts them in detention centers when they arrive in America." See **Exhibit M** attached here.

34.      VisionQuest also prepared and submitted an economic impact study outlining the substantial economic benefit to the community and the local jobs to be created. See **Exhibit N** attached hereto.

35.      Nevertheless, on April 3, 2019, the Zoning Board arbitrarily, irrationally and without explanation rejected VisionQuest's appeal, merely stating that a new zoning permit was

required. See "Notice of Decision," attached hereto as **Exhibit O**. This decision was issued

despite the substantial and unchallenged case law that was presented in support of VisionQuest's

position that a new zoning permit was not required.

36.     As a result, 60 beds at the Facility remain empty, and the 70 healthcare providers,

educators, social workers and other employees who are specifically trained to help Child

Refugees and unite them with either relatives or qualified guardians remain idle.

## COUNT ONE

### (Deprivation of Civil Rights pursuant to  42 U. S.C. §1983)

37.     Plaintiff repeats and reiterates each and every allegation of the foregoing

paragraphs of this Complaint as though fully set forth herein.

38.     42 U.S.C. § 1983 prohibits "the deprivation of any rights, privileges, or

immunities secured by the Constitution and laws" of the United States "under color of" state law.

39.     The Fourteenth Amendment of the U.S. Constitution provides that "no State shall

'deprive any person of life, liberty, or property, without due process of law."

40.     A municipal land use decision may deprive a plaintiff having a property interest

of substantive due process. See, e.g*., DeBlasio v. Zoning Bd. Of Adjustment, Twp. Of W. Amwell,*

53 F. 3d 592, 600 (3d Cir.), cert. denied, 516 U.S. 937 (1995). Cases involving zoning decisions,

building permits, or other governmental permission required for some intended use of land

owned by the plaintiff "implicate the fundamental property interest in the ownership of land."

*Cherry Hill Towers, LLC v. Twp. Of Cherry Hill,* 407 F. Supp. 2d 648, 654 (D.N.J. 2006),

quoting DeBlasio, supra, 53 F. 3d at 600. "[O]wnership is a property interest worthy of

substantive due process protection," and "where the governmental decision in question impinges

upon a landowner's use and enjoyment of property, a land-owning plaintiff states a substantive due process claim where he or she alleges that the decision limiting the intended land use was arbitrarily or irrationally reached." *DeBlasio,* supra, 53 F. 3d at 600-01.

41.     In this case, VisionQuest had a protected leasehold property interest that was deprived by the arbitrary, capricious, and irrational decision to deny plaintiff the already permitted use of the property for the housing of juveniles that they were not sentenced criminal offenders under the jurisdiction of the criminal court system.

42.     The City's Zoning Board of Adjustment's (ZBA's) decision, made under color of law, in refusing to allow VisionQuest to fulfill the terms of its contract with ORR and to house 60 Child Refugees, was based, upon information and belief, the impermissible and discriminatory purpose of excluding Latino children originating in Central America from obtaining temporary housing in the Facility within the City of Philadelphia.

43.     But for the impermissible and discriminatory purpose demonstrated by the ZBA members, the decision would have not been made to bar VisionQuest from using the Facility for the housing of these Refugee Children without requiring plaintiff to undergo a time-consuming and costly process of applying for a new permit.

44.     As a result of defendant's actions, VisionQuest has suffered monetary damages in an amount to be determined at trial, and the Refugee Children have suffered incalculable damages by being deprived of a safe and habitable living environment that the plaintiff was fully prepared to provide to them at the Facility.

### Demand for Jury Trial

45.     Plaintiff demands a trial by jury on all issues so triable.

WHEREFORE, plaintiff respectfully requests the following relief:

a.  An award of damages against the defendants in an amount to be determined at

    trial;

b.  Injunctive relief requiring defendants to permit plaintiff to use its Facility for

    the housing of Refugee Children under its Contract with ORR as a permitted

    use under the existing use permit;

c.  An award of attorneys' fees and costs; and

d.  Such other and further relief as this Court deems just and proper.

Dated: New York, New York
       April 17, 2019

                              McCALLION & ASSOCIATES LLP

                                  /s/Kenneth F. McCallion

                              _____

                              By: Kenneth F. McCallion
                                  James Burchetta, of counsel
                                  100 Park Avenue – 16th floor
                                  New York, New York 10017
                                  (646) 366-0884

                                  JD KATZ P.C.
                                  Jeffrey D. Katz, Esq.
                                  3 Bethesda Metro Ctr
                                  Bethesda, MD 20814
                                  (301) 913-2948

                                  Attorneys for Plaintiff

## VERIFICATION

MARK M. CONTENTO, declares under penalties of perjury as follows:

1. I was President of VisionQuest National Ltd., Plaintiff in the above-captioned matter, for ten years prior to January 1, 2019 and currently serve as VisionQuest's Corporate Legal Counsel and authorized representative.

2. I have reviewed the foregoing Complaint and find its contents to be true and correct, except for those portions asserted upon information and belief, and as to those paragraphs, I believe them to be true and correct.

Dated: Tucson, Arizona
      April 17, 2019

                                     MARK M. CONTENTO